IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASIS INTERNET SERVICES, et al.,

    Plaintiffs,

v.

RICHARD RAUSCH, et al.,

    Defendants.

No. 08-03186 EDL

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING PLAINTIFFS' MOTION TO SEVER, DENYING AS MOOT PLAINTIFFS' MOTION TO DISMISS AND GRANTING LEAVE TO FILE AMENDED COMPLAINT**

Plaintiffs Asis Internet Services and Joel Householter, dba Kneeland Engineering, dba Foggy.net allege that they have received 24,724 unsolicited commercial email advertisements from Defendants[1] Richard Rausch, Kirk Whiting, and Edward Heckerson, who are individuals doing business as Find a Quote. Plaintiffs allege that Defendants have violated the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. § 7701 et seq., which restricts the transmission of unsolicited commercial email.

On October 16, 2008, the clerk of the court entered default against Rausch and Whiting. On March 19, 2009, the clerk entered default against Heckerson. On July 7, 2009, the parties stipulated to set aside default against Heckerson. Also on July 7, 2009, Plaintiffs withdrew their motion for default judgment against Rausch, Whiting and Heckerson. On September 3, 2009, the parties stipulated to set aside the default against Whiting. Rausch remains in default.

On September 8, 2009, Heckerson and Whiting answered the amended complaint. On October

---

[1] Plaintiff dismissed Defendant Mark Theis on March 2, 2009.

1  30, 2009, Plaintiffs filed a motion for summary judgment against Heckerson, and later filed a proof
2  of service dated October 30, 2009. The motion was set for hearing on December 22, 2009. When
3  Heckerson did not file an opposition, the Court continued the hearing and provided another
4  opportunity for him to oppose. Despite the continuance, Heckerson did not file an opposition to the
5  Motion for Summary Judgment by the December 29, 2009 deadline. Accordingly, the Court held a
6  hearing on Plaintiff's motion for summary judgment on January 19, 2010. At that hearing, the Court
7  permitted Plaintiffs to file additional briefing on the question of whether Plaintiffs had standing.

8  On February 9, 2010, Plaintiffs filed a supplemental declaration of the president of Asis
9  Internet Services in support of Plaintiff's standing. Later, on February 18, 2010, Plaintiffs filed a
10 Motion to Dismiss Defendant Whiting and a Motion to Sever Defendant Rausch. No Defendant
11 opposed the motions. On March 30, 2010, the Court held a hearing on the Motion to Dismiss and
12 the Motion to Sever, and a further hearing on the Motion for Summary Judgment. The Court
13 provided Plaintiffs another opportunity to file additional briefing on the issue of damages under the
14 CAN-SPAM Act, which Plaintiffs filed on April 2, 2010.

15 For the reasons stated at the January 19, 2010 and March 30, 2010 hearings and in this Order,
16 Plaintiffs' Motion for Summary Judgment is granted, Plaintiffs' Motion to Sever is granted, and
17 Plaintiffs' Motion to Dismiss is denied as moot because the Court granted Plaintiffs leave to file an
18 amended complaint.

19 **Motion for Summary Judgment against Defendant Heckerson[2]**
20 **Facts**

21 Plaintiff Asis Internet Services is an internet access service, in operation since 1995, in
22 Garberville, California. See White Decl. ¶ 2. Asis owns various domain names used to provide
23 internet and email services. See id. ¶ 9. Asis provides dial-up and broadband internet and email
24 service to much of the population of Garberville. See id. ¶ 2. Asis has just under 1,000 internet
25 access and email customers. See id. Asis provides its services through its own equipment, service
26 agreements with Postini, Falcon Knight, AT&T and other vendors, and its team of four employees.

27

28  [2] Plaintiffs and Heckerson have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).

1  See id. ¶ 7.

2  Asis receives approximately 200,000 spam emails per day to all of its and its customers; email
3  accounts, both active and inactive. See White Decl. ¶ 5.  It costs approximately $3,000 per month to
4  process spam emails in both processing and employee costs. See id.  Some emails have a higher
5  cost if they contain viruses or hacker software, or if they result in customer complaints. See id.  Asis
6  occasionally suffers network and server slow downs based on daily receipt of spam emails. See id.

7  Between November 16, 2006 and May 5, 2008, Asis received 24,724 emails from Defendants
8  that are the subject of this case. See White Decl. ¶ 6.  Asis received the emails first on its filtering
9  service operated by Postini, then transferred, processed and stored the emails on its email server, and
10 then transferred the emails to its attorney where they were stored on a special spam storage and
11 investigation server. See id.; Ex. C.

12 **Legal Standard**

13 Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on
14 file, and any affidavits show that there is no genuine issue as to any material fact and that the movant
15 is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).  Material facts are those which
16 may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
17 A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return
18 a verdict for the nonmoving party. Id.  The court must view the facts in the light most favorable to
19 the non-moving party and give it the benefit of all reasonable inferences to be drawn from those
20 facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must
21 not weigh the evidence or determine the truth of the matter, but only determine whether there is a
22 genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

23 A party seeking summary judgment bears the initial burden of informing the court of the basis
24 for its motion, and of identifying those portions of the pleadings and discovery responses that
25 demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317,
26 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively
27 demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue
28 where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

3

merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

**Discussion**

Plaintiffs move for summary judgment based on 15 U.S.C. §§ 7704(a)(1) and (a)(2) of the CAN-SPAM Act. The CAN-SPAM Act prohibits such practices as transmitting messages with "header information that is materially false or materially misleading." See 15 U.S.C. § 7704(a)(1).[3] Further, the CAN-SPAM Act prohibits transmission of a commercial electronic message by a person with actual or fairly implied knowledge that the subject heading would be likely to mislead a

---

[3] 15 U.S.C. § 7704(a)(1) states:

(a) Requirements for transmission of messages

(1) Prohibition of false or misleading transmission information

It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph--

(A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;

(B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and

(C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

recipient about a material fact regarding the contents of the message. See 15 U.S.C. § 7704(a)(2).[4]

**Standing**

"[T]he CAN-SPAM standing inquiry involves two general components: (1) whether the plaintiff is an 'Internet access service' provider ('IAS provider'), and (2) whether the plaintiff was 'adversely affected by' statutory violations." Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1049 (9th Cir. 2009). As to the first element, the Ninth Circuit noted that the CAN-SPAM Act defines "Internet access service" by reference to the Communications Act, see 15 U.S.C. § 7702(11), which provides:

> The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services.

47 U.S.C. § 231(e)(4). The Ninth Circuit declined to set forth a general test or to define the outer bounds of what an IAS provider is, but stated generally that: (1) providing email accounts alone is not sufficient to be an IAS provider; (2) IAS providers are generally distinct from entities that merely carry or receive such email; and (3) there may be a technical or hardware component implicit in the definition. Gordon, 575 F.3d at 1051-52. The plaintiff in Gordon was not an IAS provider because he did not have physical control over or access to the hardware, his service appeared to be limited to using a control panel via an ordinary Internet connection through an ISP to set up email accounts and other administrative tasks, he had a nominal role in providing internet services, and he did not take any precautions to avoid receiving spam. See Gordon, 575 F.3d at 1052.

Here, by contrast, Plaintiff is a corporation licensed to do business in California that provides

---

[4] 15 U.S.C. § 7704(a)(2) states:

(2) Prohibition of deceptive subject headings

It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message (consistent with the criteria used in enforcement of section 45 of this title).

5

1 dial-up, broadband internet and email service to almost 1,000 customers. See White Decl. ¶ 2. It
2 has been in business since 1995, provides services using its own equipment, has service contracts
3 with outside vendors, and has four employees. See id. ¶ 7. There is no triable issue of fact as to
4 whether Plaintiff is an ISP.

5 As to the second element, the Gordon court did not provide an outer limit of the meaning of
6 "adversely affected" in this context, but did define some of its contours. First, the "type of harm
7 envisioned by Congress did not encompass the ordinary inconveniences experienced by consumers
8 and end users." Gordon, 575 F.3d at 1053. Instead, the "harms redressable under the CAN-SPAM
9 Act must parallel the limited private right of action and therefore should reflect those types of harms
10 uniquely encountered by IAS providers." Id. The sorts of harms that may be within the statute
11 include: (1) "the cost of investing in new equipment to increase capacity and customer service
12 personnel to deal with increased subscriber complaints;" (2) "maintaining email filtering systems
13 and other anti-spam technology on their networks to reduce the deluge of spam;" and (3) "network
14 crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades,
15 network expansion, and additional personnel." Id. However, ordinary filtering costs do not
16 constitute a harm. Id. at 1054 ("We expect a legitimate service provider to secure adequate
17 bandwidth and storage capacity and take reasonable precautions, such as implementing spam filters,
18 as part of its normal operations."). The Gordon court declined to enumerate each and every harm
19 that might satisfy the adverse affect element, but stated that "at a minimum . . . the harm must be
20 both real and of the type experienced by ISPs . . . . the harm must be of significance to a bona fide
21 IAS provider - something beyond the mere annoyance of span and greater than the negligible
22 burdens typically borne by an IAS provider in the ordinary course of business." Id. at 1053-54
23 (citing Hypertouch v. Kennedy-Western Univ., 2006 WL 648688, at *4 (N.D. Cal. Mar. 8, 2006)
24 (finding evidence of "decreased server response and crashes," "higher bandwidth utilization," and
25 "expensive hardware and software upgrades" sufficient harm for statutory standing)).

26 The Gordon court did not decide whether there must be a direct causal link between the
27 particular emails at issue in litigation and the ISP-type harms, but stated that:

28 > To give the statutory text meaning there must be, at bare minimum, a demonstrated relationship between purported harms and the type of e-mail practices regulated by

6

> the Act-i.e., a showing that the identified concerns are linked in some meaningful way to unwanted spam and, in turn, represent actual harm. The e-mails at issue in a particular case must, at the very least, contribute to a larger, collective spam problem that caused ISP-type harms.

Gordon, 575 F.3d at 1054. The Gordon court rejected the argument that the harm for standing purposes is merely "the cost of carrying SPAM emails over the [Internet access provider's] facilities." Id. at 1053, n.11. The plaintiff in Gordon had not demonstrated that he was "adversely affected" because: (1) he had not hired additional personnel; (2) he had not experienced technical concerns or incurred costs that can be necessarily attributed to commercial email; and (3) he purposefully refused to implement spam filters or to make any other attempt to block spam. See Gordon, 575 F.3d at 1055.

Here, unlike the plaintiff in Gordon, Plaintiffs have made a sufficient showing of adverse affect. Specifically, Plaintiffs initially stated that they receive 200,000 spam emails per day, that processing the emails costs approximately $3,000 per month, that some emails have a higher processing cost, that Asis occasionally experiences network slow downs due to spam, and that Asis' contract with vendors provides for spikes in bandwidth without additional cost. See White Decl. ¶ 5. Plaintiffs also state that the emails at issue in this case were received by Postini, a filtering service, and then processed and transferred to Asis's servers, and then transferred to counsel. See White Decl. ¶ 6. Plaintiffs have further stated that some its clients are local businesses that lack the resources to adequately screen for spam, and so hire Plaintiffs to do so. See Supp. White Decl. ¶ 3. Three of Plaintiffs' clients complained about the specific spam at issue in this case, and resolution of those complaints consumed twenty-two hours of Plaintiffs' staff time. See Supp. White Decl. ¶¶ 4-8. Plaintiffs lose customers regularly as a result of spam, and would realize over one third more revenue per year if they did not have to spend money on addressing spam. See id. ¶¶ 9-10. Plaintiffs' showing of standing is sufficient under Gordon, which requires "some combination of operational or technical impairments and related financial costs attributable to unwanted commercial email." Gordon, 575 F.3d at 1053-54.

**Merits of Plaintiffs' claims**

Plaintiffs' motion is based on Heckerson's failure to answer Requests for Admissions. Plaintiffs served the Requests for Admission on September 9, 2009. See Singleton Decl. Ex. A3.

7

Those Requests address the crux of the CAN-SPAM issues in this case.  For example, Request Number 3 stated: "Admit that Defendant Edward Heckerson is, or was in the business of internet marketing via sending, or having sent, bulk commercial email messages;" Request Number 5 stated: "Admit that Defendant Edward Heckerson sent bulk commercial email messages for marketing purposes;" Request Number 6 stated: "Admit that Defendant Edward Heckerson knew that the Affiliates they were using to acquire leads were sending, or hiring others to send, unsolicited commercial electronic emails in violation of the CAN-SPAM Act;" Request Number 7 states: "Admit that Defendant Edward Heckerson knew that the Affiliates they were using to acquire leads were sending, or hiring others to send, commercial electronic emails with false header information in violation of the CAN-SPAM Act;" Request Number 9 stated: "Admit that Defendants Edward Heckerson knew that the Affiliates they were using to acquire leads were sending, or hiring others to send, commercial electronic email advertisements with misleading information on their behalf;" Request Number 12 stated: "Admit that even though Defendants Edward Heckerson claims it does not tolerate SPAM by its Affiliates, Defendant Edward Heckerson has taken no action sufficient to stop or limit the use of SPAM by its Affiliates;" and Request Number 15 stated: "Admit that Defendant Edward Heckerson sent or had sent by Affiliates, on Defendant's behalf, commercial electronic mail messages advertising insurance that were sent to email addresses at the email server with domain name of: asis.com, during the period of November 16, 2006 through May 5, 2008." See id.  Heckerson did not respond to the Requests for Admission.  See Singleton Decl. ¶ 6.  On October 13 and 15, 2009, Plaintiffs sent a letter and email advising Heckerson's counsel of the overdue responses.  See id. ¶ 6; Ex. B.  Heckerson did not respond to the letter or email.  See id. ¶ 6.

If a party does not respond to Requests for Admission, they are deemed admitted.  See Fed. R. Civ. P. 36(a)(3).  Rule 36 is self-executing; a matter that is admitted under this rule is conclusively established unless the court permits the admission to be withdrawn or amended.  See Fed. R. Civ. P. 36(b).  Unanswered requests for admissions may be relied on as the basis for granting summary judgment.  See Conlon v. U.S., 474 F.3d 616, 621 (9th Cir. 2007), citing O'Campo v. Hardisty, 262 F.2d 621, 624 (9th Cir. 1958); United States v. Kasuboski, 834 F.2d 1345, 1350 (7th Cir.1987) ("Admissions made under Rule 36, even default admissions, can serve as the factual predicate for

8

summary judgment."); Cereghino v. Boeing Co., 873 F.Supp. 398, 403 (D. Or. 1994) (resulting admissions not improper merely because they relate to ultimate fact or prove dispositive of entire case).

By failing to respond to Plaintiffs' Requests for Admission, Heckerson has admitted liability under the CAN-SPAM Act. Specifically, with respect to the violation of § 7704(a)(1), Heckerson admits that he was in the business of internet marketing via sending or having sent bulk commercial email messages, that he contracted with one or more affiliates to send bulk commercial email messages and that he sent or had his affiliates send commercial electronic email messages containing false header information (Request Numbers 3, 4, 7). In addition, with respect to § 7704(a)(2), Heckerson admits that he knew that his affiliates were sending or hiring others to send commercial electronic mail advertisements with misleading information (Request Number 9).

Further, Heckerson's admissions satisfy the additional knowledge requirement when an action is brought by an ISP. Specifically, § 7704(a) prohibits the "initiation" of certain types of misleading email messages. Initiate is defined by the CAN-SPAM Act as: ". . . to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message." 15 U.S.C. § 7702(9). "Procure," in turn, is defined to mean: ". . . intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf." 15 U.S.C. § 7702(12). Further, when an ISP brings an action under the CAN-SPAM Act, a special definition of "procure" applies:

> In any action brought under paragraph (1), this chapter shall be applied as if the definition of the term "procure" in section 7702(12) of this title contained, after "behalf" the words "with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this chapter".

15 U.S.C. § 7706(g)(2). Pursuant to the Requests for Admission, Heckerson admitted that he knew that his affiliates were sending or hiring others to send unsolicited commercial electronic emails in violation of the CAN-SPAM Act, that he knew that the affiliates were sending emails with false header information, misleading subject lines, and misleading information, and that he has established a pattern and practice of using spammers to acquire sales leads (Request Numbers 6, 7, 8, 9, 14).

9

Accordingly, there is no triable issue of fact as to whether Heckerson violated the CAN-SPAM Act, and Plaintiffs' Motion for Summary Judgment is granted.

**Damages**

In an action brought by an Internet service provider, statutory damages are available:

> For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or attempted to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or attempted to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 7704(b)(1)(A)(i) of this title, treated as a separate violation) by--
>
> (i) up to $100, in the case of a violation of section 7704(a)(1) of this title; or
>
> (ii) up to $25, in the case of any other violation of section 7704 of this title.

15 U.S.C. § 7706(g)(3)(A). Courts have discretion to award treble damages if the court finds that the defendant acted willfully and knowingly or the unlawful activity included one or more of the aggravated violations in § 7704(b). See 15 U.S.C. § 7706(g)(3)(C). Aggravated violations contained in § 7706(b) include directory harvesting and automated creation of multiple email accounts, both of which Plaintiffs argue occurred here. In assessing damages, courts may consider whether the defendant has established and implemented commercially reasonable practices and procedures to prevent CAN-SPAM Act violations or the violation occurred despite commercially reasonable efforts to maintain compliance with the CAN-SPAM Act. See 15 U.S.C. § 7704(g)(3)(D). Courts may also award attorneys' fees and costs. See 15 U.S.C. § 7706(g)(4).

Plaintiffs seek statutory damages in the maximum amount of $100 per email for each violation of § 7704(a)(1), and in the maximum amount of $25 per email for each violation of § 7704(a)(2), for a total of $3,090,500.00. Because there is no evidence that Heckerson has a practice or procedure in place to prevent CAN-SPAM Act violations, and he has admitted that he has taken no action sufficient to stop or limit the use of spam by his affiliates, the statutory bases for reducing damages under § 7704(g)(3)(D) have not been met here.

At the hearing on March 30, 2010, the Court expressed doubt that Plaintiffs would be entitled to the maximum amount of statutory damages on the facts of this case, and provided Plaintiffs leave to file supplemental briefing on the issue of damages, and in particular, to address the approach

10

1   taken by Facebook, Inc. v. Wallace, 2009 WL 3617789 (N.D. Cal. Oct. 29, 2009). In Facebook, the
2   plaintiff sought a default judgment of over $7 billion in statutory damages under the CAN-SPAM
3   Act and California Business and Professions Code section 22948.3 against an individual who
4   engaged in a phishing and spamming scheme that compromised the accounts of a substantial number
5   of Facebook users. The court found that statutory damages were justified because the defendant
6   "willfully violated the statutes in question with blatant disregard for the rights of Facebook and the
7   thousands of Facebook users whose accounts were compromised by his conduct," and willfully
8   violated the TRO and preliminary injunction issued in that case. Facebook, 2009 WL 3617789, at
9   *2. Even so, and not ruling on the question of whether the award would violate due process, the
10  Facebook court was not persuaded that an award of over $7 billion was proportionate to the
11  defendant's offenses. Id. at *2. The court exercised its discretion to decline to award all of the
12  damages requested by the plaintiff, and instead awarded $50 for each of the 14,214,753 violations of
13  the CAN-SPAM Act, and a set amount for one violation of the state law, for a total award of
14  $711,237,650.00. Id. Given the magnitude of the award, the Facebook court declined to award
15  treble damages. Id.

16  Statutory damages are warranted in this case given Heckerson's violations of the CAN-SPAM
17  Act. However, as in Facebook, the Court is not persuaded that an award of $3 million is
18  proportionate to Heckerson's offenses, even without reaching the issue of whether the award would
19  violate due process. This case involves far fewer emails than in Facebook, so the misconduct was
20  less pervasive and widespread. Further, Heckerson did not willfully violate an injunction in this
21  case. Heckerson simply did not engage in the same level of misconduct as the Facebook defendant,
22  so an award of the maximum statutory damages is not warranted.

23  Instead, this case is more similar to Tagged, Inc. v. Does 1 through 10, 2010 WL 370331 (N.D.
24  Cal. Jan. 25, 2010). There, the defendant initiated a total of 6,079 spam emails to users of a social
25  networking site seeking to fraudulently entice users of that website to click on hyperlinks in those
26  spam messages that would take the user to an adult dating website. Tagged, 2010 WL 370331, at *
27  1. The court entered default judgment in favor of the plaintiff for, among other things, violations of
28  several provisions of the CAN-SPAM Act. Id. at * 6. With respect to damages, however, the court

United States District Court
For the Northern District of California

11

1  concluded:

2  > It is true that defendant's violations, from what plaintiff has alleged, were intentional and willful, and statutory damage awards are justified to punish defendant and to deter future violations. That does not justify an award of nearly two million dollars under the CANSPAM Act to plaintiff. A court has wide discretion to determine the amount of statutory damages between the statutory maxima and minima. In calculating statutory damage, some courts have looked to estimates of actual damages. Here, plaintiff gives no estimates of actual damages to itself nor how much defendant profited from his actions. Plaintiff cites to three other default judgment orders to supports its position that it is entitled to nearly two million dollars in this instant action. In Facebook v. Guerbuez, No. C08-03889 (N.D.Cal. decided Nov. 21, 2008), Facebook was awarded $873 million against a defendant who had sent four million spam emails to other Facebook users. In Myspace v. Wallace, 2008 U.S. Dist. LEXIS 75752 (C.D.Cal. May 28, 2008), Myspace was awarded $223 million against a defendant who had sent nearly 400,000 messages and posted 890,000 comments from 320,000 "hijacked" Myspace.com user accounts.
>
> In contrast, in this instant action, defendant Vogeler sent 6,079 individual emails to 6,079 Tagged users. Accordingly, this order concludes that it is just to award statutory damages of $25 per violation, amounting to a total of $151,975. These damages along with permanent injunction will adequately serve the purpose of punishment and deterrence.

Id. at *11-12 (internal citations omitted). Accordingly, the Court awards statutory damages of $25 per violation of § 7704(a)(1), and $10 per violation of § 7704(a)(2), for a total statutory damages award of $865,340.00.

Plaintiffs argue that they are entitled to treble damages. Although Plaintiffs did not seek treble damages in the original summary judgment motion, Plaintiffs raised the treble damages issue at the hearing and in the supplemental briefing. Plaintiffs have provided persuasive evidence that Heckerson engaged in conduct that warrants aggravated damages, and the total amount of trebled damages is less than the award sought in Plaintiffs' motion.

The CAN-SPAM Act provides that:

> (C) Aggravated damages
>
> The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if--
>
> (i) the court determines that the defendant committed the violation willfully and knowingly; or
>
> (ii) the defendant's unlawful activity included one or more of the aggravated violations set forth in section 7704(b) of this title.

15 U.S.C. § 7706(g)(3)(C). Plaintiffs argue that Heckerson engaged in aggravated violations by conducting a directory harvest, which is prohibited under § 7704(b)(1)(A), and using automated

12

scripts to acquire email accounts, which is prohibited under § 7704(b)(2).

### Directory harvest

The CAN-SPAM Act states that a directory harvest is an aggravated violation of the Act:

> (1) Address harvesting and dictionary attacks--
>
> It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message that is unlawful under subsection (a) of this section, or to assist in the origination of such message through the provision or selection of addresses to which the message will be transmitted, if such person had actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that--
>
> (i) the electronic mail address of the recipient was obtained using an automated means from an Internet website or proprietary online service operated by another person, and such website or online service included, at the time the address was obtained, a notice stating that the operator of such website or online service will not give, sell, or otherwise transfer addresses maintained by such website or online service to any other party for the purposes of initiating, or enabling others to initiate, electronic mail messages; or
>
> (ii) the electronic mail address of the recipient was obtained using an automated means that generates possible electronic mail addresses by combining names, letters, or numbers into numerous permutations.

15 U.S.C. § 7704(b)(1)(A). According to Plaintiffs' president, Nella White, a directory harvest can be demonstrated by looking at the actual emails which all contain both the "sent to" email account and the actual name of the customer owning the account in the header information in the email. White Decl. in Support of Brief re: Aggravated Damages ¶ 4; Ex. A. Ms. White testified that many of the email accounts that received the spam emails at issue in this case are closed and have been closed for some time. Id. ¶ 5; Ex. B. However, the emails identify the actual consumer who owned the email accounts. Id. According to Ms. White, the only way someone could have obtained the customer information is through a directory harvest because the information does not exist anywhere else and the owners of the accounts no longer have access to the email accounts to solicit emails. Id. ¶ 6. Further, Ms. White states that Plaintiffs provide an Acceptable Use Policy on its servers, which has been in place for a number of years. Id. ¶ 7; Ex. C. Ms. White's declaration is persuasive and undisputed evidence that Heckerson conducted a directory harvest that justifies treble damages under § 7706(g)(C).

### Automated scripts

The CAN-SPAM Act states that use of automated scripts is an aggravated violation of the Act:

> (2) Automated creation of multiple electronic mail accounts
> It is unlawful for any person to use scripts or other automated means to register for multiple electronic mail accounts or online user accounts from which to transmit to a protected computer, or enable another person to transmit to a protected computer, a commercial electronic mail message that is unlawful under subsection (a) of this section.

15 U.S.C. § 7704(b)(2). According to Josh Mohland, a programmer/analyst for Plaintiffs' counsel's firm, the emails in this case demonstrate use of an automated script. Mr. Mohland stated that there were 4,408 unique email addresses in the "From" headers of the 24,724 emails at issue in this case. Mohland Decl. ¶ 3. The majority of the emails followed the pattern: name@subdomain.domain.com. Mohland Decl. in Support of Brief re: Aggravated Damages ¶ 3; Ex. A. The "name" portion was either related to the product being advertised (e.g., lower mortgage@), or a common name (e.g., joe@). Id. ¶ 4. The subdomains used in the emails usually contained a word and a number (e.g., mail1). Id. ¶ 5. The pattern of emails also involved sending emails from multiple subdomains and domains using the same "name," such as jesse@mx7.greenthe.com, jesse@mx11.greenthe.com, jesse@m15.oilca.com and jesse@vmx15.penintatt.com. Id. ¶ 6. Mr. Mohland opined that it is common practice for spammers to acquire thousands of email accounts and domain names through automated scripts because the current technology identifies the spammer fairly quickly and puts the sending email account, domain name and IP address on blacklists and reputation-based lists used by spam filtering services used by the sending and receiving ISPs to block additional further spam from those addresses. Id. ¶ 8; Ex. B. Mr. Mohland provides persuasive and undisputed evidence that Heckerson used automated scripts, which constitutes an aggravated violation under the statute and justifies treble damages.

Accordingly, the Court exercises its discretion to treble the statutory damages award of $865,340.00, for a total award of $2,596,020.00.

**Motion to Sever Defendant Rausch**

Provided no substantial right will be prejudiced, particular parties may be severed on the grounds that joinder is improper under Federal Rule of Civil Procedure 20. See William Schwarzer, et al., Federal Civil Procedure Before Trial, § 16:161 (Rutter Group 2009) (citing Coughlin v.

14

Rogers, 130 F.3d 1348 (9th Cir. 1997)).  Rule 20 provides for joinder of defendants if the right to relief is asserted against them jointly, severally, or alternatively with respect to or arising out of the same transaction or occurrence, and there is a common question of law or fact among defendants. See Fed. R. Civ. P. 20.  Here, joinder of Rausch was not improper because Plaintiffs allege that he was involved, along with the other Defendants, in the business that caused the spam at issue in this case.

However, even where joinder is proper, a court may order severance under Federal Rule of Civil Procedure 21 to prevent delay or prejudice.  See Schwarzer, Federal Civil Procedure Before Trial, § 16:162 (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1296 (2000)).  Here, Rausch is in default and has filed for bankruptcy.  He has not consented to this Court's jurisdiction under 28 U.S.C. § 636(c).  His presence in this lawsuit prejudices Plaintiffs because the Court is prevented from ruling on the summary judgment motion as to Heckerson, who has appeared, answered and consented.  Accordingly, there is good cause to sever Rausch, and Plaintiffs' motion to sever Rausch is granted.

**Motion to Dismiss Defendant Whiting**

The Court lacks authority to rule on Plaintiffs' motion to dismiss because Defendant Whiting has not consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).  See Nasca v. Peoplesoft, 160 F.3d 578, 578-79 (9th Cir. 1998).  As stated at the hearing, however, the Court granted Plaintiffs leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15 to remove Whiting as a Defendant.  Plaintiffs filed their amended complaint on April 2, 2010.  Accordingly, Plaintiffs' Motion to Dismiss Defendant Whiting is denied as moot.

**IT IS SO ORDERED.**

Dated: May 3, 2010

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge